*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CF-0972

ANTONE WATKINS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF3-05457)

(Robert A. Salerno, *Judge*)

(Argued November 13, 2025                    Decided August 13, 2026)

*Nancy E. Allen* for appellant.

*Timothy R. Cahill*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Daniel J. Lenerz*, *Gregory Evans*, and *Mark Levy*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

BECKWITH, *Associate Judge*: Carlos Rodriguez was assaulted and robbed in an alley in the District of Columbia by a group of men—one of whom he said had a gun. The government prosecuted Antone Watkins in connection with the incident, and after a jury trial, he was convicted of armed robbery, assault with a dangerous

weapon (ADW), two associated counts of possession of a firearm during a crime of violence (PFCV), and unauthorized use of a vehicle (UUV) for taking Mr. Rodriguez's truck.

On appeal, Mr. Watkins argues that the trial court erred in several respects and further contends that the government presented insufficient evidence that he committed the offenses while armed. We agree with Mr. Watkins as to his first two claims of error—specifically, that the trial court abused its discretion when it allowed Mr. Rodriguez to testify as to his fear of Mr. Watkins and when it permitted the investigating detective, David Naples, to testify about the contents of surveillance footage of the crime that was lost after he viewed it. Because those two errors, viewed together, were not harmless as to the counts that had a weapon as an element, we reverse Mr. Watkins's armed robbery, PFCV, and ADW convictions. We affirm Mr. Watkins's UUV conviction, however, because the evidence as to that charge was overwhelming despite the serious errors.

## I.     Background

Mr. Rodriguez testified that on the night of the incident, he went in search of marijuana, met up with a woman who said she could get him the drugs, and was brought to a back alley where he was struck with a firearm and robbed by a group of men he did not know. The government's theory at trial was that the woman set Mr.

Rodriguez up to be robbed and that Mr. Watkins was the man who assaulted Mr. Rodriguez with the gun. Because the D.C. Housing Authority (DCHA) failed to preserve its surveillance footage of what occurred in the alley,[1] the government primarily relied on Mr. Rodriguez's testimony.

Specifically, Mr. Rodriguez testified that on the night of the incident, he drove his truck to southwest D.C. "to get some weed." There, he met up with a woman— seen on surveillance footage from an MPD camera wearing a white T-shirt and blue shorts—who told him she could help him acquire marijuana. Mr. Rodriguez stated that the woman called someone on her cell phone prior to leading him to an alley. A man dressed in all white entered the alley by foot and pointed a gun at the woman, yelling at her to "get the fuck outta here before we kill you."[2] That same man held Mr. Rodriguez down and searched him while Mr. Rodriguez bit him. In testimony that was corroborated by preserved surveillance footage of streets leading to the alley, Mr. Rodriguez said that at some point during the encounter, two other men

---

[1] Detective Naples testified that he "submitted a request to [DCHA] to preserve and send [him] the video footage" of the alley, but that DCHA had not preserved the recording. The United States explained to the trial court that the video was "not preserved" due to a "technical issue" and that it "was never in the Government's possession." As is discussed in greater detail *infra* in Part II.A, Detective Naples testified that he had seen the lost footage, and he was permitted over objection to testify as to the contents of that footage.

[2] Mr. Rodriguez initially told police that the individual with the gun "[p]ossibly had dreads or had short hair," but stated at trial that "[h]e had dreads."

arrived in the alley on bicycles to assist the man with the gun.[3] The first man (the one who entered the alley by foot) hit Mr. Rodriguez "multiple times" with a "firearm," pointed the weapon at him "a couple of times," tried to hold him down and searched him. The other two men also "reached in [his] pockets" during the encounter. Mr. Rodriguez turned over his truck keys and other possessions[4] to the assailant who entered the alley by foot because he saw the man's "hands on the trigger" of his gun. Mr. Rodriguez remembered the gun being "black-grayish,"[5] and though he initially testified that the firearm was "probably like a .40 or .45," he later stated that it was definitely smaller than a 45-caliber because "that shit would have knocked [him] out." After the attack, Mr. Rodriguez arrived "bloody," "hurt, dizzy, drowsy," and with a broken tooth to the home of a family friend named Mary Thomas, who proceeded to call 911. Mr. Rodriguez was taken to the hospital, where he spoke with an MPD detective.

---

[3] Specifically, Mr. Rodriguez testified that "two little buddies" of the man with the gun "came around the corner" after the armed man got scared because he noticed that Mr. Rodriguez "was trying to reach for the gun."

[4] In addition to his truck keys, Mr. Rodriguez had $500 in cash, a "couple chains," and a watch in his possession.

[5] His description of the gun as "like black grayish" came in his interview with police after the incident, but at trial, he testified that "[a]ll [he] remember[ed] [wa]s black."

Mr. Rodriguez could not identify the woman who offered to help him buy marijuana or any of the men who attacked him in the alley. Detective Naples testified that, through his investigation aided by surveillance footage, he was able to locate and speak with the woman and identify her as Sherry Clark. The government also introduced evidence identifying the first man—the one who entered the alley on foot and instigated the attack on Mr. Rodriguez—as Mr. Watkins. Specifically, in surveillance footage of the area surrounding the alley, the three male assailants are each wearing all white, while the man who entered the alley first by foot has visible a "red design with a black object in the center" on the back of his shirt, allowing him to be tracked throughout the footage. Detective Naples showed still images of the man with the distinctive shirt to Mr. Watkins's ex-girlfriend and to Mr. Watkins's probation officer, Sean Stallman, and both identified the man in the image as Mr. Watkins. The other two assailants were not identified.

The preserved surveillance footage shows that the man identified as Mr. Watkins met up with the woman identified as Ms. Clark at a nearby recreation center. The footage later depicts Mr. Watkins walking toward the alley, Ms. Clark entering the alley with Mr. Rodriguez, and the two unidentified men cycling into the alley. A few minutes later, the footage shows Ms. Clark leaving the alley, and later the men on bicycles exiting as well.

In the footage from another camera, Ms. Clark can be seen arriving at Mr. Rodriguez's truck parked nearby and eventually getting in on the passenger side. Mr. Watkins can then be seen "running from the alley" to "the driver side of [Mr. Rodriguez's] truck" and entering that side of the truck. The truck is then seen being driven back to the recreation center, where Mr. Watkins exits the driver's side of the truck and Ms. Clark meets up with him at the recreation center about a minute later. Mr. Watkins begins dumping objects out of the truck as Ms. Clark assists him, and the two are seen rummaging through the truck's contents.

The government also presented social media evidence, cell-site evidence, DNA evidence, and Ms. Clark's phone records.[6] Detective Naples testified that the phone records showed a call from Ms. Clark to Mr. Watkins at the same time the woman identified as Ms. Clark is seen on surveillance footage holding an object with an illuminated screen in her left hand and then putting that hand up to her left ear. Mr. Watkins's probation officer, Mr. Stallman, testified that he watched a live video Mr. Watkins streamed on Instagram approximately one month after the incident in which Mr. Watkins lifted his shirt to show a black and gray gun in his waistband. The government also admitted another Instagram post in which Mr. Watkins is

---

[6] The phone records were for a person named "Cheryl Clark." Detective Naples testified that he knew that Sherry Clark's mother was named Cheryl Clark, so it was "possible" that the records were for someone else.

wearing shoes that match the shoes seen on the man identified as Mr. Watkins in the surveillance footage.

A crime team scientist with the D.C. Department of Forensic Sciences testified that DNA evidence recovered from Mr. Rodriguez's jeans "provide[d] limited support for [the] inclusion of Mr. Watkins," and DNA evidence recovered from the interior driver door handles, arm rests, and windowsill of Mr. Rodriguez's truck "provide[d] limited support for [the] exclusion of Mr. Watkins."[7] Further, the scientist testified that Mr. Watkins was "excluded as being a potential contributor" from swabs of the truck's steering wheel and gear shift because the DNA of only one individual—Mr. Rodriguez—was detected. An expert in the field of historical mobile device location analysis testified that cell-site data showed that between 10:33 p.m. and 11:45 p.m. on the night of the incident, it was "likely" that Mr. Watkins's cell phone was at the crime scene location (the alley) and the recovery location (the recreation center) "during the relevant time periods."

---

[7] Inclusion "means the sample matches the reference sample taken directly from an individual"—here, Mr. Watkins—while exclusion "means the sample does not match." *Barber v. United States*, 179 A.3d 883, 891 (D.C. 2018) (internal quotation marks omitted).

After deliberating for one day, the jury found Mr. Watkins guilty of armed robbery, ADW, two related counts of PFCV, and UUV (of Mr. Rodriguez's truck). He now appeals his convictions.

## II.     Mr. Watkins's Claims of Error

### A.     DCHA Surveillance Video

We begin with Mr. Watkins's argument, with which the government agrees, that the trial court erred when it allowed Detective Naples to narrate for the jury the unauthenticated contents of the lost DCHA surveillance footage over defense counsel's objection. Specifically, Detective Naples was permitted to testify that the DCHA video was "[c]onsistent with what [Mr. Rodriguez] said is being struck with the firearm and then individuals going through his pockets and taking items from him." He went on to say that "the video shows actions consistent with the one individual that's identified as Mr. Watkins in this case, going up to the victim, striking him, going through his pockets."

We review evidentiary rulings for abuse of discretion. *Blackson v. United States*, 979 A.2d 1, 10 (D.C. 2009). The government concedes this was error, and we agree. Lay witnesses must have personal knowledge of that to which they testify. *Johnson v. United States*, 116 A.3d 1246, 1248-49 (D.C. 2015). Police officers who

have not "witnessed the events" in question do not "obtain[] personal knowledge" of events "solely by watching recorded surveillance footage." *Callaham v. United States*, 268 A.3d 833, 848 (D.C. 2022) (internal quotation marks omitted). Here, defense counsel had opened the door to a limited range of questions about the DCHA video footage by eliciting testimony (on cross-examination) from Detective Naples that there was footage capturing the incident that was not presented in court. But "[o]pening the door is one thing. . . . [W]hat comes through the door is another. Everything cannot come through the door." *Furr v. United States*, 157 A.3d 1245, 1252 (D.C. 2017) (citation omitted). Where Detective Naples did not testify on cross-examination that he had *viewed* the unpreserved footage, the prosecutor went beyond the bounds of what was needed "to remove any unfair prejudice [that] might otherwise have ensued from the original evidence." *Id.* (citation omitted). The trial court therefore should not have permitted Detective Naples to testify as to what he observed "solely by watching recorded surveillance footage," *Callaham*, 268 A.32d at 848, where that footage was not authenticated, the jurors and the defense were

unable to view it, and defense counsel could not effectively challenge Detective Naples's testimony on cross-examination.

The government nonetheless argues that the error was harmless. We address harm cumulatively in Part III. *See In re C.A.*, 186 A.3d 118, 126 (D.C. 2018) (assessing harm by looking at the impact of two errors together).

## B. Fear Testimony

Next, Mr. Watkins argues that the trial court erred when it allowed Mr. Rodriguez to testify as to his fear of Mr. Watkins. On cross-examination, when defense counsel was questioning Mr. Rodriguez on inconsistencies between his trial testimony and his statements to police shortly after the incident, Mr. Rodriguez blurted out that he was "trying to help" Mr. Watkins, but defense counsel was "ticking [him] off." On redirect, in an apparent attempt to clarify Mr. Rodriguez's peculiar testimony, the prosecution elicited the following testimony, which Mr. Watkins contends was erroneously admitted:

> Q. Why did you tell [defense counsel] that you were trying to help him out—help out his client?
>
> A. Me admitting who did it, that's why.
>
> Q. Sorry, what was that?
>
> A. For me admitting to who assaulted me.

Q. Do you know who did that?

A. Gosh. No, I don't.

Q. I see you looking to your right—

[Defense counsel]: Objection.

The court: Overruled.

By [the prosecution]:

Q. Are you being truthful?

A. I don't know.

Q. Why do you say you don't know? Are you scared?

[Defense counsel]: Objection.

The witness: Yes, I'm scared for my life. Yes.

The court: Overruled.

By [the prosecution]:

Q. Why are you scared?

A. Because I don't know if this individual might harm me or my folks.

Q. And would you recognize him if you saw him out in the streets?

A. No, I wouldn't. I wouldn't recognize him until this day that y'all presented to me, yes.

The defense did not request a curative or limiting instruction, nor did the trial court provide one sua sponte. The government argues that the line of questioning and elicited testimony were permissible primarily because the prosecution was entitled

to explain to the jury Mr. Rodriguez's odd demeanor and confusing statement that he was trying to help Mr. Watkins, as well as to cure defense counsel's attempted impeachment of Mr. Rodriguez with prior inconsistent statements he made to police.

Like above, we review this evidentiary ruling for abuse of discretion. *Blackson*, 979 A.2d at 10. "[E]vidence concerning a witness'[s] fear tends to be extremely prejudicial because it appeals to the passions of the jury and may cause the jury to base its decision on something other than rule of law." *Id.* at 10-11 (quoting *Gordon v. United States*, 783 A.2d 575, 586 (D.C. 2001)); *see Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. 1999) (cautioning trial courts regarding the "admission of potentially inflammatory evidence"). Therefore, "permissible questioning and argument by prosecutors about witness fear—especially fear of the defendants on trial—must be the limited exception rather than the rule." *Murray v. United States*, 855 A.2d 1126, 1133 (D.C. 2004); *see also Parker v. United States*, 797 A.2d 1245, 1249 (D.C. 2002) ("[I]t is generally improper for a prosecutor to elicit evidence that a witness has a fear of the defendant.").

Where evidence is probative of a witness's "generalized fear," as opposed to his specific fear of the defendant, that evidence may be admissible to help the jury understand why "the witness has previously withheld information or makes

conflicting statements." *Parker*, 797 A.2d at 1249-50 (collecting cases).[8] But even where the testimony elicits only a generalized fear, we still caution trial courts to conduct a "sensitive balancing of probative value versus prejudice" because a jury may nonetheless hold the fear evidence against the defendant. *Blunt v. United States*, 959 A.2d 721, 725 (D.C. 2008). We have said that fear testimony can be prejudicial in situations like this, where it is used to insinuate that the witness would otherwise make an in-court identification but for his fear of the defendant. *Cf. McClellan v. United States*, 706 A.2d 542, 552-53 (D.C. 1997) (holding that it was error where the prosecutor asked the jury to infer that the witness would have identified the shooter but for her fear of retaliation); *Simpson v. United States*, 877 A.2d 1045, 1048 (D.C. 2005) (relying on our holding in *Mercer*, 724 A.2d at 1184, that "evidence concerning a witness'[s] fear tends to be prejudicial" to find prosecutorial error where the government suggested in its closing that the witness had not identified the shooter out of fear of the defendant).

---

[8] *Compare Clayborne v. United States*, 751 A.2d 956, 964 (D.C. 2000) (finding no abuse of discretion where testimony about fear of general "retaliation for snitching" used to explain why witness would not identify defendant), *with Mercer*, 724 A.2d at 1187-88 (finding error where government "attempt[ed] to link" courtroom spectators who it had "intimat[ed] . . . were friends" with the defendants and "created an impression that the spectators were there to influence the testimony of the witnesses" because it "implied that there was a threat coming from the defendants").

In *Blunt v. United States*, we held that it was error to permit a witness to testify that "she had been stabbed repeatedly for her prior testimony in the same case" because that evidence "carried a serious risk of implying an unfounded link to [the appellant]." 959 A.2d at 725. Even though the trial court in *Blunt* gave a cautionary instruction,[9] we thought it likely that jurors might "speculate . . . that no one else had the same motive to retaliate as did [the appellant] or persons acting for him." *Id.* (internal quotation marks omitted). Though the government argues that *Blunt* is easily distinguishable because Mr. "Rodriguez's testimony implied no similar attempt by [Mr.] Watkins to threaten him," we disagree. Here, the elicited testimony was exactly the sort of specific fear testimony of which we are wary. *See Gordon*, 783 A.2d at 588; *Blunt*, 959 A.2d at 725. The prosecutor pointed out to the jury that he saw Mr. Rodriguez "looking to [his] right"—where Mr. Watkins was apparently sitting—prior to asking Mr. Rodriguez if he was telling the truth and if he was scared.

---

[9] The government notes that "[a]lthough it may have been preferable for the trial court to issue a cautionary instruction," here defense counsel did not request such an instruction. Mr. Watkins responds that any request would have been futile given that the trial court swiftly overruled the defense's objections. Regardless, even where given, such an instruction may still be an inadequate remedy for the admission of prejudicial fear testimony. *See Blunt*, 959 A.2d at 724-25 (holding that "a limiting instruction was not an adequate substitute for exclusion of [fear] testimony in the circumstances" and emphasizing that "[a]lthough a forceful limiting instruction may serve to prevent . . . speculation in some cases, the likely efficacy of an instruction must be assessed in each case against the danger inherent in the explanation for fear that the witness is expected to give").

The natural implication of the prosecutor's intimation was that Mr. Rodriguez was operating under implied or explicit intimidation by Mr. Watkins, thus "play[ing] on the passions and fear of the jury, by suggesting that a threat exist[ed] against" him. *Mercer*, 724 A.2d at 1187.

Even assuming this was the sort of fear testimony that we sometimes deem permissible to "explain specific behavior of the witness," *Blackson*, 979 A.2d at 11 (quoting *Ebron v. United States*, 838 A.2d 1140, 1148 (D.C. 2003)), it is not apparent that Mr. Rodriguez's initial testimony on cross-examination that he was trying to help Mr. Watkins actually hurt the government—making it doubtful that the government had anything to "explain," *cf. McClellan*, 706 A.2d at 551-52 (suggesting that it is not always error where a "witness'[s] credibility has been attacked [by the defense] on the basis of her initial failure to tell the truth to the police" and the government introduces "evidence that the real reason for her silence was . . . self-protective fear"). To be sure, Mr. Rodriguez's statement was confusing. But that incoherence limited the testimony's ability to cause the government a level of prejudice that warranted such a potent "fix"—the jury might plausibly have inferred, for example, that the odd testimony hurt the *defense* by insinuating that Mr. Watkins had engaged in some form of inappropriate communication with the witness.

Regardless, where the prosecution has an "alternative, less prejudicial method to accomplish the same goal," it should instead deploy that tactic in lieu of introducing fear testimony. *Mercer*, 724 A.2d at 1187-88 (explaining that the prosecution could instead have "established that [the witness] was only testifying due to a subpoena, and that [the witness] did not want to be in the courtroom"). Here, the government had already elicited testimony that Mr. Rodriguez did not want to be there and that he had been "placed into custody by the U.S. Marshals for failing to appear." And the prosecution explained Mr. Rodriguez's odd courtroom demeanor in its closing without reference to the fear testimony, telling the jury:

> Now, I want to take a moment and talk to you about Carlos [Rodriguez]. I think in the kindest of words Carlos is a character. He took the stand and he provided information he had to be brought. Would the Government prefer that he answered the question more directly? Yes.
>
> Would the Government prefer that he showed His Honor a little bit more deference? Yes. We readily admit that. We don't choose our victims. . . .
>
> Now you have heard quite a bit but I want to tell you what you have heard from Carlos both at the start of this case and when he took the stand, is consistent with the charged offenses.

The government therefore had a variety of other tools at its disposal—which it, in fact, utilized—to help rehabilitate Mr. Rodriguez. Accordingly, admitting the prejudicial fear testimony was error.

## C.    Other Asserted Errors

Mr. Watkins also argues that the trial court abused its discretion by (1) permitting Detective Naples to narrate other surveillance footage that was preserved and shown to the jury and (2) allowing the government to identify Mr. Stallman as Mr. Watkins's probation officer.

As to the impermissible-narration argument, the government correctly notes that our review is for plain error because defense counsel failed to object at trial. *Walker v. United States*, 201 A.3d 586, 593-94 (D.C. 2019). Therefore, to prevail, Mr. Watkins must show "(1) error, (2) that is plain, and (3) that affected [his] substantial rights." *Id.* at 594 (internal quotation marks omitted) (quoting *Lowery v. United States*, 3 A.3d 1169, 1173 (D.C. 2010)).

As explained above, detectives do not gain personal knowledge "solely by watching recorded surveillance footage." *Callaham*, 268 A.3d at 848. We found error, for example, in *Geter v. United States*, 306 A.3d 126, 135, 138-39 (D.C. 2023), where investigating detectives who had no prior acquaintance with the appellant and no knowledge of his "well-known bodily features or patterns of movement" purported to identify him in surveillance video solely by their purported familiarity with his clothing—which they gained after interviewing him on the night of the incident—because the video did not capture a clear image of the assailant's face. But

this case is unlike *Geter*. Here, Detective Naples did not purport to identify Mr. Watkins solely based on the video footage but instead relied on identifications by those who knew Mr. Watkins. And Detective Naples did exactly what *Geter* condoned: He reviewed video footage from one point in time and, after proper foundation was laid, testified "about the distinctive clothing the suspect was wearing" and then "purport[ed] to identify that same clothing in the surveillance footage." *Id.* at 139. Here, even if there had been error, it would not have been plain. *See Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) ("plain" means "clear or, equivalently, obvious" error at the time of appeal (citation modified)).

As to Mr. Watkins's probation-officer argument, we agree with the government that any argument was waived[10] and that any error was invited. Mr. Watkins not only failed to object to the testimony at trial, his counsel *agreed* with the government that Mr. Stallman could testify that Mr. Watkins was on probation under his supervision and also consented to the jury instructions proposed by the

---

[10] While we use "forfeiture" to describe when a defendant "default[s]" or "fail[s] to raise a claim before the trial court," we use "waiver" to mean an "intentional relinquishment or abandonment of a known right or privilege." *Chew v. United States*, 314 A.3d 80, 91 (D.C. 2024) (Easterly, J., concurring) (quoting *Allen v. United States*, 495 A.2d 1145, 1151 & n.11 (D.C. 1985) (en banc)). Whereas forfeiture does not preclude review, waiver does. *Id.* Here, we use "waiver" because defense counsel explicitly agreed to the prosecution's line of questioning.

government, making only one edit.[11] Because a party may not "assert[] as error on appeal" a claim based on "a course that he or she has induced the trial court to take," we decline to consider this argument. *Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007).

### III.   Harm

Even where the trial court erroneously admits evidence, we will affirm if we conclude that the errors were harmless. *E.g.*, *Smallwood v. United States*, 312 A.3d 219, 227 (D.C. 2024). "In assessing harm, we examine the trial court's two erroneous evidentiary rulings together," *In re C.A.*, 186 A.3d at 126, and consider the "cumulative impact" of those errors to determine if they "substantially influenced the jury's verdict," *Foreman v. United States*, 792 A.2d 1043, 1058 (D.C. 2002). In so doing, "we evaluate the significance of the alleged errors and their combined effect against the strength of the prosecution's case." *Id.* Where "the errors complained of [go] to critical issues at trial" and the evidence of guilt is not overwhelming—that is, where we cannot say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the

---

[11] In fact, the prosecutor "defer[red]" to "whether the defense want[ed]" jury instructions on the matter at all. Therefore, we also do not consider Mr. Watkins's argument that the jury instructions addressing the mention of Mr. Watkins being on probation were more prejudicial than they were curative, therefore compounding the asserted error.

judgment was not substantially swayed by the error[s]"—the error is not harmless, and we must reverse. *Id.* at 1058-59 (second alteration in original) (internal quotation marks and citation omitted) (reversing where the evidence was not "overwhelming" and there were multiple prejudicial errors that "went to critical issues at trial"); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see also Gordon*, 783 A.2d at 588 (in determining if the errors "compromised the fairness of the trial" or "had a possible substantial impact upon the outcome" we look at "the closeness of the case, the centrality of the issue affected, and the steps taken to mitigate the effects of the error" (quoting *Mercer*, 724 A.2d at 1194)).

### A.    Armed Robbery, ADW, and PFCV

We start by considering whether Mr. Watkins's convictions for armed robbery, ADW, and PFCV were substantially swayed by the trial court's errors. As noted above, because there was no "plainly visible" firearm in any of the surveillance footage shown to the jury, the government's case that Mr. Watkins was armed with a firearm hinged primarily on Mr. Rodriguez's testimony that he saw a firearm and that a man (identified by others as Mr. Watkins) pointed it at a woman, pointed it at him, and struck him on the head with it. And Mr. Rodriguez was far from a perfect witness—the government described him at trial as "a character." He made clear that he did not wish to testify, telling the jury, "I don't go by the police. I don't like

police," and that he did not want to be in court "telling the stories that [he was] telling" but was there only because he was "forced . . . because [he] got locked up just because they want[ed] [him] to talk." He used obscenities on the stand, at one point asking the trial judge, "So what the fuck—what is the point of being a victim if I'm going to still be criminalized . . . as an individual?" He was combative, directing the trial judge to "[l]et [him] talk" when his testimony was interrupted and warning defense counsel during cross-examination, "You gonna get me mad for real, bruh, I swear," and, "Swear, you going to get me wrong . . . when you say that shit, bruh."

In addition, Mr. Rodriguez's "testimony was the cornerstone of [the government's] case, and he was not what anybody would call an unimpeachable witness." *Dugger v. United States*, 295 A.3d 1102, 1119 (D.C. 2023). He was impeached with his prior convictions, including for second-degree assault and possession of a handgun. He admitted to smoking marijuana prior to the assault, *see (Michael) Robinson v. United States*, 50 A.3d 508, 524 (D.C. 2012) (explaining that "a witness'[s] use of drugs is not a collateral issue when an evidentiary foundation can be established that the witness was using drugs at the time of the incident" (alteration in original) (quoting *Durant v. United States*, 551 A.2d 1318, 1326 (D.C. 1988))), that it was dark outside when the assault took place, and that his vision was "impaired." He also testified that being hit with the alleged gun the first time caused

him to "lo[se] conscious[ness]," and the second time caused him to "drop[] to the ground" at which point his vision went "blurry" and "dark." On cross-examination, he changed his narrative, stating that he was not in fact "unconscious . . . but [he was] trying to breathe and trying to hold on for [his] life." Though Mr. Rodriguez testified that he was certain that he was hit in the face with a firearm, and not another object, there was reason for a factfinder to question his certainty beyond just his erratic demeanor: it was nighttime, his vision was blurred, and he testified that "[i]t fe[lt] like a fucking brick. Something—an iron."

Other inconsistencies in Mr. Rodriguez's statements cast further doubt on his credibility. For example, Detective Naples testified that Mr. Rodriguez initially told the police that "multiple people surrounded his car" and "that he was dragged out [of] the car and into a[n] alleyway." According to Detective Naples, it was only when Mr. Rodriguez overheard officers talking about a security camera that he then changed his story to one that matched his in-court testimony.[12] On cross-examination, Mr. Rodriguez was questioned about his mental-health history, which included psychosis and schizophrenia diagnoses causing him to "see and hear things when they aren't truly true, or accurate or present." He testified at trial that

---

[12] At trial, even after being shown body-worn camera footage, Mr. Rodriguez asserted that he had never told that alternative story to officers and that any officer who stated as much was lying.

his diagnoses affected his memory but did not affect his ability to tell the truth, though he was impeached with his grand jury testimony where he stated the opposite. On redirect, he clarified that, as to that grand jury testimony, he meant he had not been "hearing or seeing anything on the night of this offense."

Here, "[p]roof of the government's case" as to the gun "depended essentially upon the credibility of [one] witness[]." *Ebron*, 838 A.2d at 1150; *see also United States v. Coleman*, 552 F.3d 853, 855-56, 860 (D.C. Cir. 2009) (holding that—even where the central witness himself was a police officer—the government's evidence was not overwhelming because "[t]here was no independent corroborating evidence" that an appellant was armed and that the error impermissibly bolstered that officer's testimony that he saw the appellant with a gun). By erroneously permitting Detective Naples to testify that the lost DCHA surveillance footage corroborated Mr. Rodriguez's testimony including as to the firearm, the testimony of the government's key (and flawed) witness was impermissibly bolstered—by a police officer, no less. *See In re C.A.*, 186 A.3d at 127 (not harmless error where trial court wrongfully precluded impeachment and allowed in rehabilitation evidence "on the central question" because that "may have altered the trial court's assessment of [the witness's] credibility"). Where a law-enforcement witness is allowed to "bolster[] strongly what could reasonably be viewed as an otherwise marginal case from the government's standpoint" by "adding the weight of the police officer's

status to the complainant's testimony," we have previously concluded that the error was not harmless, *Tibbs v. United States*, 359 A.2d 13, 16 (D.C. 1976), and we adhere to that same principle here.

On top of that, the impermissible fear testimony risked diverting the jury's focus on whether the government had satisfied its burden to prove beyond a reasonable doubt that Mr. Watkins or one of his collaborators possessed a gun during the attack and instead invited it to focus on the improper evidence of Mr. Rodriguez's asserted fear of Mr. Watkins. Contrary to what the government argues, the fear testimony did not merely suggest to the jury "what they would 'naturally have understood anyway'—that the victim of a violent crime would fear testifying against the man charged with that crime." When we said as much in *Murray v. United States*, we were referring to a prosecutor's rhetorical question to the jury, "Is it reasonable to assume that these people [the witnesses] were scared, that these people did not want to testify because they're scared and if that is reasonable to assume, who would they be scared of? . . . Those three people. Right? Why else would they be reluctant?" 855 A.2d at 1131. That summation was based on a witness's statement that she had tried to avoid testifying, as well as the fact that there were material witness warrants issued so that other witnesses appeared. *Id.* at 1130-31. We concluded that any error was harmless because "the reason the prosecutor gave for why the witnesses were afraid of appellants" was that "they had watched . . .

appellants' involvement in the crime or its antecedent events," and thus the closing did not "allude[] to conduct by the defendant(s) assertedly meant to intimidate him or her *as* a witness." *Id.* at 1134-35.

But here the error was not merely a suggestion that Mr. Rodriguez was scared because he had been the victim of a violent crime. As explained *supra* in Part II.B, his testimony was specific to Mr. Watkins and very well may have prejudiced the jury against Mr. Watkins by creating the inference, without any factual basis, that Mr. Watkins had threatened Mr. Rodriguez. Further, unlike in *Murray*, where the prosecutor conjectured that the witnesses may have been scared, here the government elicited direct testimony from Mr. Rodriguez that he was fearful, in fact scared "for [his] life," while leaving little doubt about whom he feared.[13] *See Foreman*, 792 A.2d at 1051 ("This type of [fear] evidence could very well have

---

[13] The government relies on the fact that the prosecution did not mention or rely on Mr. Rodriguez's fear testimony during closing argument as proof that it was harmless. While a prosecutor's reliance upon fear testimony in closing argument can lend support to an argument that that testimony prejudiced the defendant, such references are not a prerequisite to finding error or harm in this context. *See Mercer*, 724 A.2d at 1183 & n.3, 1194-95 (finding that fear testimony was not harmless even where it was not referred to in closing argument); *Foreman*, 792 A.2d at 1048-51, 1058-59 (in a cumulative-impact analysis, finding that fear testimony—in addition to other errors—was not harmless even where it does not appear to have been referred to in closing argument).

aroused the passions of the jury and suggested a conviction based on their aversion to [the appellant], rather than on the evidence.").

It is true that Mr. Rodriguez's testimony was not the only evidence the government introduced as to the gun. The government presented social media posts showing Mr. Watkins in possession of a gun with coloring that was consistent with Mr. Rodriguez's account of being assaulted with a "black grayish" firearm. Despite the government's argument that the gun in the social media post was a color match, that color is not so rare that the match—when combined with Mr. Rodriguez's problematic testimony—constitutes *overwhelming* evidence that Mr. Watkins was armed with a gun. As the government itself acknowledged at oral argument, "black and gray are not the most uncommon colors." The government also offered photographs of Mr. Rodriguez's injuries, as well as testimony from Ms. Thomas that Mr. Rodriguez arrived "a little bit disoriented" at her house with a chipped tooth and "blood all over his face and his clothes." To be sure, his injuries were consistent with being hit in the face with a firearm, but they were also consistent with being hit in the face with another hard object—as Mr. Rodriguez told the jury, the assault felt "like a . . . brick."

We therefore hold that the cumulative impact of the errors, one that reinforced a flawed witness's testimony as to the existence of a gun and the other that risked

the jury inferring that Mr. Watkins had threatened Mr. Rodriguez prior to his testimony, was not harmless as to the gun issue where the errors went to a critical question at trial and risked irreparably prejudicing the jury against Mr. Watkins, and where the evidence that there was a gun at all was not overwhelming. The government's only theory at trial was that Mr. Rodriguez was assaulted with a *gun*, and on appeal it did not advance an argument in its briefing as to why we should affirm Mr. Watkins's convictions for armed robbery or assault with a deadly weapon if we found the errors not harmless as to the presence of a firearm.[14] As to armed robbery, the government's brief addresses only the possibility that the jury might "have had reasonable doubt as to whether Watkins was the one who wielded the gun," arguing that the evidence was overwhelming because it presented an aiding-and-abetting theory on armed robbery to the jury. But because we determine the evidence was not overwhelming that there was a gun *at all*, not that the evidence was not overwhelming that *Mr. Watkins* had a gun, we are unpersuaded. And as to ADW, the government's brief states that the conviction should be vacated based on merger and does not independently argue that any error was harmless as to that

---

[14] Though the government contended at oral argument that this court could affirm the armed robbery conviction on the theory that Mr. Watkins used a deadly weapon other than a firearm, "[i]n general, we do not consider points raised for the first time with this court at oral argument." *Lumbih v. Wilson*, 328 A.3d 399, 401 (D.C. 2024).

count. In the absence of focused briefing by the government on these points, we do not speculate regarding Mr. Watkins's guilt of armed robbery or ADW on a theory different from that presented to the jury, and we accordingly reverse Mr. Watkins's armed robbery, ADW, and PFCV convictions.

### B.  Unauthorized Use of a Vehicle

The evidence that Mr. Watkins committed UUV was overwhelming, however, and we therefore conclude that the errors, even when considered cumulatively, were harmless as to those convictions. The surveillance footage introduced at trial was consistent with Mr. Rodriguez's general narrative. Mr. Rodriguez testified that it was the same man who entered the alley on foot rather than by bicycle who struck him in the face with a hard object and who took the keys to his truck, and the surveillance footage shows the man identified as Mr. Watkins driving Mr. Rodriguez's truck to the recreation center. Mr. Watkins's cell phone records and the cell-site data supported the inference that Mr. Watkins was in the relevant area during the relevant time, communicating with Ms. Clark. Two individuals identified Mr. Watkins in still images taken from the preserved surveillance footage stills and the individual they identified can be easily tracked throughout that footage, corroborating Mr. Rodriguez's testimony. And though the DNA evidence was not definitive, some of it did provide limited support that Mr. Watkins was involved.

In sum, as serious as they were, the trial court's erroneous rulings allowing Mr. Rodriguez to testify as to his fear of Mr. Watkins and permitting Detective Naples to testify about the contents of the lost surveillance footage of the crime did not substantially sway the verdict as to Mr. Watkins's conviction for UUV.

## IV.    Sufficiency

Mr. Watkins argues lastly that the evidence that he was armed with a firearm was constitutionally insufficient. *See Mejia-Cortez v. United States*, 256 A.3d 210, 218 (D.C. 2021) ("The right to be convicted only upon proof of each element beyond a reasonable doubt is in fact a fundamental aspect of due process."). We disagree.

"We review the sufficiency of the evidence de novo" while considering "*all* the evidence admitted at trial, including the evidence [Mr. Watkins] claims should have been excluded, regardless of whether the court erred in admitting it." *In re T.B.*, 331 A.3d 242, 248 (D.C. 2025) (emphasis in original) (first quoting *Fitzgerald v. United States*, 228 A.3d 429, 436 (D.C. 2020); and then quoting *Gore v. United States*, 145 A.3d 540, 545 n.7 (D.C. 2016)). In so doing, "[w]e view the evidence 'in the light most favorable to sustaining the judgment'" while affording equal weight to direct and circumstantial evidence. *Id.* (quoting *Davis v. United States*, 834 A.2d 861, 866 (D.C. 2003)). We affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in

original) (citation omitted). That is, we reverse where, based on the evidence, the jury could have reached its verdict only by "cross[ing] the bounds of permissible inference and enter[ing] the forbidden territory of conjecture and speculation." *Id.* (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)).

The jury had to do no such thing when it convicted Mr. Watkins of ADW or armed robbery (or their associated PFCV charges). First, because we consider even erroneously admitted evidence on sufficiency review, Detective Naples's testimony that the lost video contents were consistent with Mr. Rodriguez's account provided ample support for the jury's verdict. Plus, as noted *supra* in Part II.B, the jury was free to credit Mr. Rodriguez's testimony that he was hit in the head with a firearm. That testimony was further bolstered by the Instagram evidence that Mr. Watkins owned a black-and-gray gun, Ms. Thomas's testimony, and the photographs of Mr. Rodriguez's facial injuries. Though we hold that the evidence that Mr. Watkins was armed with a gun was not *overwhelming*, the government presented sufficient evidence to support the jury's conclusion that he robbed and assaulted Mr. Rodriguez with a gun.

## V.    Conclusion

For the reasons above, we reverse Mr. Watkins's armed robbery, ADW, and PFCV convictions, affirm his UUV conviction, and remand for further proceedings

consistent with this opinion.[15] *See (Leon) Robinson v. United States*, 100 A.3d 95, 99 (D.C. 2014) (reversing, among other things, one appellant's armed robbery conviction and noting that on remand, in lieu of a retrial for armed robbery, the trial court would have discretion, at the government's request, to enter judgment of conviction on the lesser included offense of unarmed robbery).

*So ordered.*

---

[15] Because we reverse Mr. Watkins's armed robbery, ADW, and PFCV convictions, we need not address his merger arguments.